THE BOARD OF COMMISSIONERS FOR THE FREDERICK FEMALE SEMINARY, *vs.* THE STATE OF MARYLAND.—*December* 1850.

The act of 1839, ch. 217, and its supplements, incorporating the "*Frederick Female Seminary*," do not constitute the "Board of Commissioners" therein named, a corporate body.

By this act of 1839, the board of trustees, which was to come into existence by the 5th and 6th sections of that act, is the body corporate thereby created, under the name and style of "The Trustees of the *Frederick Female Seminary*."

It was not necessary, that all the duties of the board of commissioners, should be performed, before the board of trustees could organise and open the school.

The duties to be performed by the board of commissioners, did not require a corporate existence, and for any omission of their duty, or wrongful and injurious acts, their bond given, as required by the 2nd sec. of the act of 1839, was answerable, and not the charter of the board of trustees.

The duration of the existence of the board of commissioners, in the absence of a period fixed by the act of Assembly, is determined by the duties, for the performance of which, it was created.

These two boards, of commissioners, and trustees, may exist at the same time, and a member of one, may at the same time be a member of the other.

Every allegation or matter affirmed in the preamble to an act or resolution of the legislature, is not to be considered as incontrovertible.

The board of commissioners were authorised to become a board of trustees, after the grounds were purchased, and the necessary buildings and improvements were erected thereon, and their doing this, and opening and organising a school, before the whole proceeds of the lottery grants had been received, and all the duties of the board of commissioners had been performed, was no violation of their charter,

It was their duty under the charter, to open the school as soon as they pos-

sibly could, after the grounds were purchased and paid for, and the buildings ready to receive students.

The act of 1845, ch. 75, authorising the attorney general to institute proceedings against the board of commissioners for the *Frederick Female Seminary*, to inquire whether the charter and franchises of said board, ought not to be annulled by reason of abuser thereof, only authorised charges of abuse of franchise, and did not authorise any inquiry touching the breaches alleged in the *scire facias* in this case.

That act did not authorise any proceedings against the four additional commissioners, appointed by the act of 1844, ch. 27, a supplement to the act of 1837, ch. 217.

APPEAL from *Frederick* county court.

The legislature, in December, 1845, passed an act, (1845, ch. 75,) entitled: " An act to authorise and direct the attorney general, to institute proceedings against the board of commissioners for the *Frederick Female Seminary*." The preamble states: " Whereas, it has been represented to the General Assembly of *Maryland*, on the memorial of *Alexander B. Hanson* and *Jacob Markell*, two of the commissioners of the *Frederick Female Seminary*, that the charter or franchise of said institution, hath been forfeited by certain acts of *Gideon Bantz*, *David Boyd* and *Christian Steiner*, three of the commissioners of said institution, which said acts and forfeiture, have been on the counter-memorial of said three commissioners, denied; and whereas, by mutual consent of the said parties, it hath been agreed that a *scire facias* be issued, to try the alleged forfeiture, therefore:"

*Sec.* 1. Authorises and directs the attorney general, "to institute proceedings against the board of commissioners for the *Frederick Female Seminary*, to ascertain whether the charter and corporate powers, and franchises of the said board of commissioners, ought, by reason of abuser of such powers or franchises, to be vacated and annulled."

*Sec.* 2. Provides, that in case the acts of said board shall be judicially declared to amount to a forfeiture of the charter, such declaration shall not, in fact, work a forfeiture, but all the property, effects, endowments and grants, heretofore made by the legislature, shall vest in *Alexander B. Hanson, Jacob Markell,*

*Gideon Bantz, David Boyd, Christian Steiner, Richard Potts, Frederick A. Schley, Samuel Tyler* and *Lloyd Dorsey,* and their successors, as commissioners and trustees of the *Frederick Female Seminary,* in the same manner in which said property and franchises are now vested in the original commissioners, with the same powers, rights, duties and obligations conferred on said original commissioners. The 3d section provides for a disposition of the funds of the institution, pending the *scire facias.*

Thereupon, the attorney general of the State, on the 23d of October, 1846, sued out a writ of *scire facias* from *Frederick* county court, setting forth the original charter of the *Frederick Female Seminary,* and the several supplements thereto.

The act of 1839, ch. 217, (the original charter,) by its preamble, states, that " whereas, it is represented to this General Assembly, by many citizens of *Frederick* city and county, that a female seminary, for the education of girls in the higher departments of science and literature, is much wanted in *Frederick* city; that individual contributions cannot be obtained, sufficient in amount to erect the necessary buildings, and purchase a suitable library and philosophical apparatus; and whereas, education in all its departments is a matter of public concern, and has received and ought to receive the patronage of the State, and should be promoted when the means of the State will justify; *therefore*:"

*Sec.* 1. Enacts, that *Alexander B. Hanson, William Tyler, Lawrence Brengle* and *David Boyd* of *Frederick* county, be " appointed commissioners," with authority to raise the sum of $20,000, clear of expenses, " by a scheme or schemes of lottery, and the sale or sales thereof, and the tickets therein."

*Sec.* 2. Provides, that said scheme or schemes be approved by the lottery commissioners; and before the sale thereof, the said commissioners shall give bond with security, &c., to be approved by the lottery commissioners, conditioned for the faithful discharge of their duty, and for the due application of the moneys, coming to their hands; which bond may be sued on as other public bonds, by any person interested in the condition thereof.

*Sec.* 3. Gives the power to said commissioners, to sell said scheme or schemes for such sums as they may deem proper; *provided,* the purchaser shall give bond for the punctual payment of all prizes that may be drawn to the tickets.

*Sec.* 4. "And be it enacted, that the commissioners by this act appointed, shall have full power and authority to purchase as much ground as may be necessary, in the city of *Frederick,* and to build thereon, all such houses, and make all such enclosures and other improvements as they, or a majority of them, may deem suitable for a female academy, and to have the title to the same conveyed to them, in trust, for the uses, trusts and purposes hereinafter mentioned, and to pay for the same, out of the money authorised to be raised by this act."

*Sec.* 5. "And be it enacted, that the said commissioners, after they have so purchased and paid for said ground, and had the proper buildings and other improvements thereon erected, shall be, and are hereby constituted and appointed a board of trustees, under the name and style of the trustees of the *Frederick Female Seminary,* and as such, shall hold all the said property, as well as other property that may hereafter be conveyed to them, for the use of said seminary, in trust, for the uses, and under the regulations hereinafter provided and set forth."

*Sec.* 6. Enacts, "that the said trustees and their successors, be and they are hereby declared to be a community, corporation and body politic forever, by the name and style of the *Frederick Female Seminary,*" and by that name, to have, receive and retain property, real and personal, also devises, bequests, donations, &c., and to transfer and dispose of the same, in such manner, for the benefit of the seminary, as they may think proper; *provided* said corporation shall not hold property at any time, exceeding the value of $3000 *per annum;* and the said corporation, by the name and title aforesaid, "shall be forever *hereafter,* capable in law, to sue and be sued," &c.

*Sec.* 7. Provides, that the corporation may have a common seal, &c., "and shall in general, have and exercise all such rights, privileges and immunities, as by law are incident to, or

necessary for corporations of this character, and to enable the members of the same to exercise all things concerning the design thereof, which is hereby declared to be, the promotion and advancement of female education, and the cultivation and diffusion of literature and science."

*Sec.* 8. Enacts, that on the death or resignation, &c., "of any one or more of said trustees, or their successors, it shall be the duty of the remaining trustees, or a majority of them, to appoint some suitable person or persons, to fill the vacancy or vacancies, as often as they shall occur."

*Sec.* 9. Provides, that when the "said commissioners" shall, instead of selling a scheme, sell the tickets therein, they shall pay the prizes that may be drawn, and this obligation to be within the condition of their bond.

*Sec.* 10. Enacts, that if a vacancy shall occur "in the board of said commissioners, the same shall be filled by the governor of *Maryland*," the persons appointed being required to give bond, as prescribed by the 2nd section of this act.

The act of 1841, ch. 256, was the first supplement to the above, and in its preamble states, that it was represented to the legislature "that *John Brunner of Jacob*, was intended to be appointed one of the commissioners under said act, so as to have five instead of four," and that his name was omitted in the engrossed bill by mistake, that he had given bond with the other commissioners, and was now acting as such. *Therefore:*"

*Sec.* 1. Enacts, that said *John Brunner of Jacob* be appointed an additional commissioner, with the same rights and powers, as if his name had been inserted in the original act.

*Sec.* 2. Enacts, "that the said five commissioners shall be called and known by the name and style of the board of commissioners for the *Frederick Female Seminary*," and by that name and style, shall hereafter make all contracts, and do all other acts that the four commissioners are authorised and empowered to do, under said original act.

*Sec.* 3. Provides, that said board of commissioners shall have power to appoint a secretary, whose duties, compensation, &c., are specially defined in this section.

*Sec.* 4. Gives authority to the board of commissioners to mortgage or pledge the funds received under the original act, if they find it necessary, in order " to ensure the erection and completion of all the buildings proper for said seminary, and to furnish the same with a suitable library and philosophical apparatus."

*Sec.* 5. Gives validity to the bond of *John Brunner* of *Jacob*, referred to in the preamble.

*Sec.* 6. Repeals so much of the 6th section of the original act as limits the amount of property to be held " by the trustees," to $3000 per annum.

*Sec.* 7. Enacts, " that the trustees" shall have full power to grant degrees, by diplomas to the pupils, and make such regulations in regard to granting and conferring degrees, as they may think proper.

*Sec.* 8. Makes the act go into operation immediately after its passage.

The act of 1843, ch. 48, is the second supplement to the original act, and in its preamble, it is stated, that "it is represented to the legislature, by the board of commissioners of the *Frederick Female Seminary*, and others, that the object intended to be effected by the original act, will fail, unless said board is allowed to raise a larger amount of funds, and the legislature being satisfied that said commissioners have thus far faithfully discharged their duties.   Therefore :"

*Sec.* 1. Enacts, that the grant by the original act to raise the sum of $20,000, be extended, so as to enable said board of commissioners to raise the sum of $50,000; and for that purpose, the lottery commissioners are directed to raise the additional sum of $30,000, in the same manner as they are now raising the sum authorised by the original act.

*Sec.* 2. Enacts, that the "lottery commissioners, as they shall from time to time raise said sum, shall pay the same over to the board of commissioners of the *Frederick Female Seminary* who shall apply not more than $10,000 thereof, in the same manner and for the same purposes as are set forth and provided for in the original act."

*Sec.* 3. Enacts, " that said board of commissioners shall pay the remaining $20,000 over to the trustees of the *Frederick Female Seminary*," to be by them invested for the use and benefit of the said seminary "which is hereby declared as and by way of an endowment of said seminary," and the "said trustees" shall from time to time apply the interest of such investment in such manner, for the benefit of said seminary, as they may think proper and best calculated to advance the interest of said seminary.

*Sec.* 4. Provides, that said trustees shall educate annually, after the seminary shall be in full operation, one poor orphan child from each county and city.

*Sec.* 5. Provides, that such parts of the constitution as are inconsistent with this act be repealed, *provided* this act be confirmed by the next General Assembly, as the constitution provides.

This act was confirmed and made a part of the constitution of the State, by the confirmatory act of 1844, chap. 7; and in the same year, the act of 1844, chap. 27, was passed as a further supplement to the original act. The preamble to this last supplement states, " that it is represented to the legislature, that the present number of commissioners appointed under said original act, ought to be increased from five to nine; *therefore:*"

*Sec.* 1. Enacts, " that *Richard Potts, Frederick A. Schley, Lloyd Dorsey* and *Samuel Tyler*," be appointed commissioners with the present acting commissioners of the *Frederick Female Seminary*, with the same powers, and subject to the same liabilities, in connexion with the five acting commissioners, as if they had been appointed by the original act; and said board of commissioners shall consist of nine, instead of five members, their duties, powers and obligations to be the same as prscribed by the original act and its several supplements; *provided*, the four new commissioners appointed by this act, shall not be bound in their individual capacity, for any debts or contracts due by said acting commissioners for the purchase of the ground, erection of buildings, improvements there-

49    v.9

on, &c., for which the present acting commissioners are individually bound or answerable.

*Sec.* 2. Makes the debts and responsibilities of the present board of commissioners, specific liens on the grounds purchased, and buildings erected, in favor of said commissioners, who are bound for said debts until they are paid and satisfied.

*Sec.* 3. Provides, that in case any commissioner appointed in pursuance of this act, shall refuse or neglect to execute his bond, or shall decline to serve on or before the 1st of April next ensuing the passage of this act, the governor shall proceed to fill such vacancy or vacancies, in the manner provided in the original act.

The writ then charges, that the four commissioners named in this last mentioned act, accepted the trust confided in them, and on the 12th of March, 1845, together with *Hanson* and *Markell*, two of the five commissioners, executed their bond to the State, as required by said act, whereby said four became constituent parts of said board of commissioners, and were clothed with all the powers of commissioners under said acts of Assembly, whereby the said board of commissioners, after said acceptance, consisted of nine, instead of five persons. That at the time when the five acting commissioners applied for the passage of the act granting them the additional sum of $30,000, they had purchased the grounds, and erected thereon certain buildings, intended, when completed, for said seminary, but the same were then incomplete and unfinished, and constituted only a part of the buildings intended by them to be erected and necessary to be erected for the completion of said seminary, to pass the same into the hands of the trustees as such, that they might so put it into operation as to carry out the intent of the act of 1839, ch. 217, and its supplement, the act of 1841, ch. 256; and further, that said commissioners, as such, applied for said law, and induced the legislature to pass the same, to enable them to erect and complete all the buildings proper for said seminary, and to furnish the same with a suitable library and philosophical apparatus, for which purpose they might expend, if necessary, the sum of $30,000, which

buildings, so far as constructed, were then, and still are unpaid for by the funds that have come to the hands of the commissioners. That after the additional commissioners had accepted the trust, and given bond as required, the said *Bantz, Steiner* and *Boyd* refused to enter into said bond, and refused to act with the other commissioners, and held a meeting and excluded from their said board, the four additional commissioners, in order that they as a majority of said original board of five commissioners, might carry out the unlawful acts hereinafter set forth.

The writ then proceeds to allege *three* breaches of the franchise granted by these several acts of Assembly. The 1st breach alleges, that three of said board of commissioners, viz: *Bantz, Steiner* and *Boyd*, on the 28th of July, 1846, usurped and assumed upon themselves all the franchises, privileges and powers of the office of trustees, under said acts of Assembly, and opened, organized and carried on a female seminary in the buildings of the corporation, before said buildings were finished, and while the same were incomplete and unpaid for, and although other and further buildings and improvements ought to be erected to carry out the intent of the several acts of Assembly, and although but a small part of the said sum of $50,000 had been received, or was receivable by said board of commissioners.

The 2nd breach charges, that said *three commissioners*, on the 8th of July, 1845, unlawfully organized, established and carried on a female seminary or school, in the buildings of the corporation, (which were at the time, unfinished, incomplete and unpaid for,) without having first received the full sum of $50,000 under the lottery grants, and without having performed and fully executed all their duties as commissioners, which acts the said board of commissioners have suffered, and not taken any legal steps to prevent.

The 3d breach charges, that the said *board of commissioners*, on the 8th of July, 1845, unlawfully organized, opened and carried on a female seminary or school, in said buildings, (which were at the time, unfinished, incomplete and unpaid

for,) without having first received the full sum of $50,000 from the lottery grants, and without having performed and fully executed all their duties as commissioners aforesaid, and have thereby unlawfully usurped and taken on themselves the privileges and franchises vested by the several acts of Assembly in the body corporate, styled the " *Frederick Female Seminary,*" whereby the said franchises have been defeated, and have become forfeited to the State.

The writ then commands the sheriff to give notice to the " board of commissioners for the *Frederick Female Seminary,*" to appear and show cause why their said charter ought not to be vacated and annulled, and their grants, endowments and privileges declared to be vested as directed by the act of 1845, chap. 75.

To this writ the sheriff made return thus, " made known," and the record then states, that the " said board of commissioners for the *Frederick Female Seminary,*" appeared by *Joseph M. Palmer,* their attorney, and filed a general demurrer to the writ, and the several breaches therein alleged, which the court sustained as to the *first* breach, and overruled as to the second and third. The " said board of commissioners" then, under leave to withdraw their demurrers to the second and third breach and answer anew, filed *four* pleas, the first of which, (being a plea to the second and third breaches,) avers, that the said *Bantz, Steiner and Boyd,* on the 8th of July, 1845, as a majority of the commissioners for the *Frederick Female Seminary,* under the act of 1839, chap. 217, and its supplements, did, after said board of commissioners had first purchased and paid for as much ground in the city of *Frederick* as was necessary to build thereon all such houses, and to make all such inclosures and other improvements as a majority of said commissioners deemed suitable for a female academy, and after having so purchased and paid for said ground, and had built therein all such houses and inclosures, and other improvements as a majority of said commissioners deemed suitable and necessary for a female academy, and after the title to said ground was conveyed to them in pursuance to said act of incorpora-

tion, and not before, organize as a board of trustees of the *Frederick Female Seminary,* and as such trustees did organize, establish, and carry on in said buildings, a female seminary or school, under and by virtue of said acts of incorporation.

The second plea, (a plea to the whole writ,) avers, that the three persons named in the first plea, being a majority of the board of commissioners for the *Frederick Female Seminary,* did, on the 8th of July, 1845, by virtue of the act of 1839, chap. 217, and the supplements thereto, after they had organized and constituted themselves into a board of trustees of the *" Frederick Female Seminary,"* by virtue of said act of 1839, organize, establish, open and carry on a female seminary or school, in said building, so built and erected as aforesaid. And the said board of commissioners further say, that before they organized themselves into a board of trustees, as much ground as was deemed necessary in the city of *Frederick,* was purchased and paid for, and all such suitable and proper houses, inclosures and other improvements, were built and erected thereon, as a majority of the commissioners under said act of incorporation, deemed suitable and proper for a female academy, as preliminary to the organizing, establishing and opening said female seminary or school, by said trustees as aforesaid. And said defendants further say, that said *Bantz, Steiner* and *Boyd,* after said ground, &c., was purchased and paid for, and suitable and proper houses, &c., erected, &c., thereon, under the acts of incorporation, and not before, did, in pursuance of said acts of incorporation, organize as a board, and take upon themselves the office, of trustees of the said corporation, and as such trustees, on, &c., did organize, &c., a female seminary or school, in said buildings, as they well could and might do, according to the true intent and meaning of the said act of incorporation, in the said writ of *scire facias* recited.

The third plea, (a plea to the second and third breaches,) sets forth the 5th section of the act of 1839, chap. 217. and avers, that defendants did, prior to the issuing of the writ of *scire facias* in this cause, and prior to the time of doing the

grievances therein alleged, purchase, &c., a lot of ground, in the city of *Frederick*, and make such buildings, &c., as a majority of said commissioners deemed suitable for a female academy, and did on, &c., organize themselves as a board of trustees, by and under the name and style of the " *Frederick Female Seminary*," and did then and there, as trustees, cause a school for females to be opened and carried on in the buildings erected for that purpose, by the commissioners as aforesaid, as by the act of Assembly in such case made and provided, they had a right, and were fully empowered to do.

The fourth plea, (being a plea to the third breach,) sets out the act of 1839, ch. 217, and avers that prior to the issuing the writ in this case, and the opening of the school, &c., and before they organised themselves into a board of trustees, they, as commissioners, purchased, &c., (as stated in the other pleas,) and that said commissioners, after they had so purchased, &c., and had title conveyed to them, &c., and not before, did organize as a board of trustees, and did take upon themselves the office of trustees of the *Frederick Female Seminary;* and after they had so organised, and not before, they, as such trustees, on, &c., proceeded to open, &c., a female school in the buildings erected for that purpose, as by the said act they had a right and were fully empowered to do.

The State filed general demurrers to all these pleas, and the counsel of the parties agreed that a *pro forma* judgment be rendered for the State on these demurrers. Whereupon the county court gave judgment that the liberties, privileges, franchises, property and endowments of the said board of commissioners for the *Frederick Female Seminary* should be seized into the hands of the State of *Maryland*, and the said board of commissioners be excluded and removed therefrom, and the same be vested as directed by the act of 1845, ch. 75. From this judgment, the record states the said board of commissioners for the *Frederick Female Seminary* appealed.

This appeal was taken, and the record transmitted to the December term, 1849, of this court, and a motion was then made by the State that the cause should be tried and determin-

ed at that term, as a preferred case under the act of 1831, ch. 68; sec. 4. This motion was argued by *Wm. M. Merrick* and *F. A. Schley*, for the motion, and by *Jos. M. Palmer*, against it, and the court, (DORSEY, C. J., and MAGRUDER, MARTIN and FRICK, J.,) overruled the motion, and the cause was then continued until the present term, when it was argued before SPENCE, MAGRUDER and FRICK, J.

JOSEPH M. PALMER and WM. SCHLEY, for the appellants, made the following points:

1st. On the general demurrers of the State to the pleas of the defendants, the court will examine and consider the whole record, and mount up to the first defect in substance, and give judgment against the party whose pleadings are first defective.

2nd. The *scire facias* is radically and substantially defective, for that it is not shown and made to appear in the said writ, that the commissioners, &c., are a corporation and body politic by that name, but it clearly appears that the commissioners, &c., as such, were merely fiscal agents to perform certain preliminary acts and conditions, provided for in the charter, before they could assume the character of corporators, and exercise corporate powers and franchises, as trustees of "the *Frederick Female Seminary.*"

3rd. The commissioners, as such fiscal agents, were required by the charter, to give bond to the State of *Maryland*, with approved security, conditioned for the faithful discharge of the duties and trusts reposed in them as such commissioners, &c., and they are responsible for all misconduct or breach of trust, to any person or persons, or body politic, interested in the condition thereof, and they, as a board of commissioners, are not in any way responsible as corporators.

4th. A charter is a contract or a compact between the State granting it and the corporators, and no act or acts of the corporators can legally be construed to amount to a forfeiture of the powers and franchises to them granted, unless they be such acts as amount to a breach or violation of some express or implied stipulation or condition in the charter: no such acts are charged or alleged in this *scire facias.*

5th. The board of commissioners, &c., as such, were merely fiscal agents or trustees to perform preliminary duties and conditions specified in the charter, before the corporation sprang into existance as a body politic and corporate, with the right to exercise corporate powers and franchises, and so soon as those preliminary duties and conditions were performed, the board of commissioners were, by virtue of the 4th and 5th sections of the charter, converted into a board of trustees of "the *Frederick Female Seminary*," with the right and privilege of exercising corporate franchises; and as soon as they assumed the character of trustees, &c., and became a body politic, they ceased to be and exist as a board of commissioners, &c.

6th. So soon as the board of commissioners as fiscal agents ceased to exist as such, and they were organised into a board of trustees of the *Frederick Female Seminary*, all the rights, powers, privileges and duties of the *corporation* and body politic, both fiscal and educational, devolved on them as trustees of said seminary, and they then, and not before, became amenable to the law as such body politic, &c.

7th. The writ of *scire facias* in this State against a corporation and body politic, to obtain a judgment and vacate a charter, was authorised by the act of 1832, ch. 306, and before that act, no such writ could legally be issued and sustained in *Maryland*, as writs of *scire facias* issue out of a record, hence out of the court where a record is, and in this State, all corporation-charters are created by acts of the legislature, and the acts of incorporation being recorded in the office of the clerk of the Court of Appeals of the Western Shore, and as that court has no original jurisdiction, it became necessary for the legislature to interpose and accommodate the writ of *scire facias* to the existing state of things, and that act only authorises a writ of *scire facias* to be issued against an actual legal existing corporation and body politic, capable of acting as such, who have abused their powers and franchises, and not against a corporation *de facto*.

8th. To authorise a proceeding in the name of the State, by the attorney general, to annul and vacate a charter or fran-

chises, a public injury or wrong must be charged and alleged in the *scire facias*, and proved, and if the wrong complained of is a mere private injury, in which the public has no interest or concern, and for which a civil action can be sustained, the *scire facias* is bad on general demurrer.

9th. The board of commissioners for the *Frederick Female Seminary* as such, being merely fiscal agents or trustees, are not strictly an integral part of the corporation, and as commissioners, they are only liable and responsible for all their misdoings or breaches of trusts upon their official and individual bond given to the State, by virtue of the 2nd section of the charter aforesaid.

10th. The true and legal construction of the charter in this case, is for the court, and the true intentions of the legislature and the corporators must be complied with, regardless of the letter of the acts: words must be so construed as shall best answer the intention of the legislature, and when the true intention can be discovered, it must prevail and be regarded, &c.; and in case of doubtful construction of the charter, the court will mould it according to reason and convenience to effectuate the true intention of the legislature and corporators.

11th. The supposed difficulty, &c., springing out of the 8th and 10th sections of the charter, in relation to filling vacancies, &c., in the board of trustees and the board of commissioners, vanishes by adopting the principles and theories contained in the foregoing points, as the board of commissioners as such cease to exist, the moment they legally assume the character of trustees, &c.; hence, the necessity and the power of the governor to fill vacancies in the board of commissioners cease, because the board of commissioners cease to exist as such, &c.

12th. The only charges made in said writ of *scire facias*, against the commissioners as acts of abuser, &c., are, that they organised as a board of trustees of the *Frederick Female Seminary*, and kept and carried on a female school or seminary, before they had received from the lottery grants fifty thousand dollars, and while the buildings were unfinished and incomplete and unpaid for, and it is respectfully submitted

whether such charges and acts are, according to the true construction of the charter, sufficient to work a forfeiture of the said charter and franchises under the pleadings in the case.

13th. The demurrers to the several pleas in bar filed in this case admit all the facts well pleaded, and it is expressly stated and set forth in said pleas, that all the preliminary stipulations and conditions contained in the 4th and 5th sections of said charter, necessary to be performed before the commissioners became a board of trustees, &c., by virtue of the provisions of the charter were fully and completely discharged and performed: the judgment of this court ought, therefore, to be for the appellants on the said demurrers.

14th. If there be nine corporators instead of five, as contended for by the appellees, a part of whom have been ousted and deprived of their rights and privileges by the others, the writ of *scire facias*, in the name of the State, &c., is not the legal appropriate remedy in the case, but the parties injured and aggrieved, should obtain a *mandamus*, to be issued for the purpose of trying the right and restoring them to their rights and privileges as corporators, it being the only legal and appropriate remedy in this State in such cases; as the writ of *quo warranto* has never been in use and practised under in *Maryland*.

15th. What acts of abuser or nonuser of corporators will be deemed and considered sufficient to work a forfeiture of a charter or corporate franchises must depend in a great measure upon the particular stipulations and conditions contained in the particular charter under consideration, and but little, if any aid can be derived from the examination of adjudged cases upon the subject, and every case must therefore depend for its determination upon its own particular circumstances, and the peculiar phraseology, conditions and requirements contained and embodied in the act of incorporation or charter.

16th. The facts stated and set forth in the pleas in bar of the defendants, are legally sufficient to defeat the said *scire facias*, and as all the facts set forth in the pleas are admitted by the demurrers of the State, the judgment of the county court is erroneous, and ought to be reversed.

17th. It does not appear in the record that the board of commissioners for the *Frederick Female Seminary* were, at the time of issuing the *scire facias*, a legal existing body politic and corporate by the name of the commissioners for the *Frederick Female Seminary*, capable of acting as a body politic: hence, considering the pleadings in the case, the judgment is erroneous, and ought to be reversed.

18th. The judgment of the county court, made and entered up in this case, is manifestly erroneous, as not being warranted or authorised by the act of 1845, ch. 75, which authorised the issuing of this *scire facias*, as said act declares and provides that the judicial declaration, &c., of the court, shall not, in fact, work a forfeiture of the charter, franchises and endowments of said seminary—in other words, the judgment of the court shall not, in fact, be a judgment upon which any process can be issued, or any judicial action of the court taken to enforce it, &c. The court are called upon to deliver their opinion upon an abstract proposition, without being permitted to give a judgment in the case.

19th. The right to issue the *scire facias* in this case, and the court to act under it, is by virtue of the special delegated authority given by the act of 1845, ch. 75, and that authority, &c., according to the repeated adjudications in this State upon similar questions, must be construed strictly; hence, the judgment of the court, *if for the State*, will leave the charter and franchises, &c., to remain and continue precisely as they did at the time of issuing the *scire facias*.

SAMUEL TYLER and F. A. SCHLEY, for the State.

*First.* That the organizing and carrying on a school by the corporation in the buildings, *before all the funds* under the lottery grants were received, and before all the duties of commissioners under the charter were performed, was a violation of the charter, and such a violation as works *a forfeiture.*

This proposition, though applicable to both breaches, has more particular reference to the *third breach.* In discussing it, the appellee contended:

1st. That corporate powers must be construed strictly, and must be exercised in *the manner* and *forms* of the charter.

2nd. That a corporation is created *upon trust*, and *all the terms* of its charter are *conditions* of the trust, and *if any one of them* be violated, it will work a forfeiture of the charter.

*Second.* Upon the second breach, the appellee contended: That even admitting that the nine corporators who constitute the corporation, had a right to organise and carry on the school in the buildings, before all the funds under the lottery grants were received, and before all the duties of commissioners under the charter were performed; yet that *the three* had no such right, and that the exercise of such a power *by the three*, with *the permission of the nine*, was a violation of the charter, and such a violation as works a forfeiture.

The appellee also made the following objections to the pleas of the defendant, which they contended were defects *in substance*, and therefore reached by the general demurrers.

1st. The *first plea* does not aver the receipt of *the whole* fund, to wit: the $50,000 *before* the seminary was put into operation as a seminary of learning, which was a *condition precedent*, and the performance of it ought therefore to have been averred.

2nd. This plea professes to answer *both* breaches assigned in the writ, when in fact it answers *only one*. It answers the *second*, but not the *third* breach. The *third* breach charges the acts of abuser as done by the *whole board*. To this charge the plea affords no answer.

The *second plea* is to the entire writ, and is obnoxious to the same objections as the first.

The *writ* alleges, that the board of commissioners consist of *nine* corporators. This is a *material* allegation, and the defendant has *not* traversed it, and therefore *admits it*.

The *third plea* is to both breaches, but it is only an answer to the charge against *the whole* board. It does not notice, or in any way answer the charge of *permitting a minority* to act. This being bad in part, it is bad altogether.

The *fourth plea* is to the *third breach only*, and raises the

question, and none other, of the necessity of the commissioners receiving the whole fund of $50,000, before the seminary could go into operation, according to the letter and intention of the charter. Now, even admitting this to be a good answer to the *third breach*, to which alone it is pleaded, yet not being an answer to the *whole writ*, but only to *one* of the breaches, it follows, that if the other breach be for the appellee, judgment must be for the State.

*Third.* The judgment below was properly a judgment of seizure and restitution.

MAGRUDER, J., delivered the opinion of this court.

It was made know to the General Assembly, at its December session 1839, that citizens of *Frederick* were attempting to establish a female seminary in that city, but that individual contributions were found to be insufficient for the purpose.

What the memorialists asked, it is not stated. What the General Assembly upon this representation being made to it thought proper to do for this Seminary, will be seen in the act passed during that session, entitled, "An act *to aid* in the establishment of a Female Seminary in the city of *Frederick.*"

This law names four persons, and invests them with authority to raise $20,000 by a scheme or schemes of a lottery. These four persons are styled commissioners, and in some parts of the law, a board of commissioners. To them is given authority to sell the schemes or the tickets and apply the proceeds of sale towards defraying the expenses of the building, &c.

These commissioners are also the persons to purchase the ground for this institution, and to build such houses, make such inclosures or improvements as they or a majority of them shall deem necessary for a female academy, and the property was to be conveyed to them in trust, &c.

This seemed to be every thing the legislature offered to do for the seminary until the ground was purchased and paid for and the buildings or other improvements were erected. When all this was done, a body corporate was to be brought into ex-

istence to be named. " The trustees of the *Frederick Female Seminary,*" to sue and to be sued by that name, to have its corporate seal, and to discharge the duties which this law required of them.

It is further provided, that those who are the commissioners at the time when the ground is purchased and paid for, and the buildings erected, shall be the board of trustees, with the power of filling, themselves, any vacancies that may occur. Vacancies in the board of commissioners are to be filled by the governor.

Now this board of trustees when it comes into being, is unquestionably a body corporate. But it is insisted that the same act of Assembly creates another body politic, to continue such until and only until, the board of trustees have legal existence. These two bodies politic, we are told, cannot exist at the same time, the existence of the one must terminate, when that of the other commences, and thus the conclusion is arrived at, that there could be no board of trustees to open the school, while any of the duties of the board of commissioners remained to be performed, such as occasionally paying over the proceeds of another lottery grant.

We do not think so. The General Assembly, no doubt might have created another, and more than one other, corporate body, and might have assigned to each of them some of the duties which it was thought proper to require of the board of trustees. It might have constituted a corporate body *in perpetuum*, with no power but to manage the finances of the institution and others for other purposes. The legislature might have incorporated those commissioners *eo nomine*, or by any other name, with such powers as it chose to confer upon that corporation, and then have made the same individuals a board of trustees, with corporate powers, and have brought them into existence at the same moment, and given to each *immortality*.

But it was deemed expedient not to have a corporate body, until there was a school to be opened, but to have commissioners, having it is thought no corporate name, or existence, to per-

form all the duties which were imposed upon them for the present and for an indefinite time.

We are not able to discover when or how these commissioners were incorporated for fiscal purposes, and certainly cannot learn that an individual of one board who is a member of the one, may not at the same time be a member of the other, or that the two boards cannot be in existence at the same time, and for any period of time, if the legislature so willed it. To the faithful performance of any of the duties assigned to the commissioners a corporate existence was not at all necessary. All the duties required of them, might have been performed by a single individual, as well as by a corporate body, and if a bond is required, as one was of the board of commissioners, then for any omissions of duty or wrongful and injurious acts, the bond, and not the charter of a body, never perhaps to be brought into existence, would be answerable.

But if the view which we have taken of this whole subject be correct, it is quite immaterial, whether these commissioners be a corporation, or, it may be, what is called a *quasi* corporation. An act of incorporation would neither enlarge nor lessen their powers, and the period of their existence as commissioners, would in either event, be determined by the act of Assembly, if it had fixed any period; or as it has not, with the duties, for the performance of which, the board was created.

It is said, that be these commissioners incorporated or not, in fact, they must be regarded in this proceeding, as a body politic. It would seem, however, to be as necessary to let us have a sight of the charter, as it was in the case of *Agnew against The Bank of Gettysburg*, 2 *H. & G.*, 478. Without inspecting it, how are we to determine, that the body corporate (if it be a body corporate,) has done in its corporate character, any thing which it ought not to have done. It is here assumed, that the various acts of Assembly, set forth in the *scire facias*, do not show to us the corporate duties, or even corporate existence of this board.

The defendants, we are told, have admitted, that they are a corporate body, by appearing and pleading. It is manifest,

however, that the individuals could not deny that they constituted the board, which was summoned to appear, and answer to the charges made against that board.

But what were their powers, and duties, and responsibilities as a board of commissioners? Again, it would seem to be somewhat difficult to discover who are the defendants, how many, or how few of them there are. It is supposed that there were either five or nine, but the record does not tell us any thing at all satisfactory, in regard thereto. The *scire facias* directs the sheriff, to make known to " the said board of commissioners," (without giving us the names or numbers of them,) to appear and show cause, why, &c. The sheriff's return is, " made known." Thereupon, the record proceeds: " And the said board of commissioners for the said *Frederick Seminary*, being, &c., forwarned, now here come by *Joseph M. Palmer*, their attorney." Some persons then must be *Mr. Palmer's* clients, and we necessarily suppose that he has more than one. But the sheriff alone can tell us to whom he gave the notice, and he tells us nothing more than that he gave the notice to those who, in his judgment, were " the commissioners."

Here in.court, one great matter in controversy seems to be, for how many people *Mr. Palmer* appears. For nine, says one of the parties litigant, while the other is equally positive that there are but five. If we turn to the acts of Assembly to instruct us, it would appear from them, that there were some ten or twelve of these commissioners. In answer, however, to this, as well as to some other statements we have heard about acts of Assembly, we may be told of the remarks of *Chancellor Hanson,* (4 *Har. and McHenry, p.* 10,) that " every allegation or matter, affirmed in a preamble to an act or resolution of the legislature, shall not be considered as incontrovertible. And that a man may conceal from the legislature facts, which if known to them, might have defeated his application."

We cannot take it for granted, that all who possibly may claim to be, really are clients of *Mr. Palmer*. 1st. Because there were but five, who, according to the act of 1845, were

parties, affirming and denying, and afterwards, consenting to a reference of the matters in issue, to the court; and 2ndly. Because of the four persons, about whom the controversy arises, two of them appeared as counsel against the defendants.

There is some other matter which we notice in this record, and which may have some connection with this controversy. This institution, it seems, was so fortunate, as to obtain a second lottery grant, which it is taken for granted, will be worth to it $30,000. This, however, was not obtained from the legislature. It is a *constitutional* grant. The same amendment of the constitution, which grants this to this seminary, expressly directs, that the lottery commissioners, as they shall "from time to time" raise said sum, shall pay the same over to "the said board of commissioners for the *Frederick Female Seminary*." No one can question, that "the said board" consisted but of five individuals, and a board consisting of a greater number, it would seem, can have no title to the proceeds of this (the second) lottery grant, without another change of the constitution of the State.

In this change of the constitution, we are furnished with an answer to all that has been said, in order to satisfy us, that the two boards cannot have a cotemporaneous existence. It is here required, that they shall have existence at the same time; the board of trustees to receive and apply as directed, the $20,000, all of which is to be paid to it by the commissioners.

It is made a question, what is correctly pleaded in this case? We have come to the conclusion, that the defendants have a right to insist, (the demurrer being a general demurrer,) not that the whole matter, suggested in the breaches is untrue, but that notwithstanding some of the suggestions, there is no ground for this proceeding, or for the complaint against the board of commissioners, that the school was opened, as the latter was the act of the board of trustees, determined upon and carried into execution by the trustees, after the property had been purchased and paid for, and the buildings erected. These facts, (the purchase and payment of the money, and erection of the buildings,) it is thought the demurrer admits; and then

arises the question, whether the board of trustees could come into being, and act in that character, before the money to arise from the lottery grant was, (as it has not been,) received? This whole sum, it is said, must be raised and paid over to the trustees, before they can consistently with the charter, open the school, or have existence as a board of trustees.

A conclusive answer, it is believed, will be found to this, in the 5th section of the act of 1839, which tells us when the board of commissioners shall become a board of trustees, and in this respect, certainly, the charter has never been changed.

If, when they had the power to open the school, there were females ready to enter it, and proper persons could be had to take charge of it, why should its doors be closed any longer? Their charter nowhere requires it.

Would an excuse for this *non user* be found in the inability of the lottery grant, to yield all it promised? It might have been of advantage to the institution to have this fund; for the want of it the trustees might not have been enabled to employ teachers, and therefore could not have opened the school. But we are here to assume, that able professors could be had, and that there were scholars ready to enter the school; and the question is put to us, whence the authority of the trustees to open the school, until the $20,000 were paid over to them? Their authority is to be found in their charter and office, which made it their duty to open the school as soon as they possibly could, after the building was ready to receive students, and the lot paid for. Could the mere grant of a lottery scheme have the effect to delay opening the school? We are required here to believe, that although the buildings were all of them in a state of preparation, the library procured, the philosophical apparatus purchased, the ablest professors ready to enter upon their duties, students demanding admittance, and although too this institution was enriched by the contributions of individuals, yet the buildings must be unoccupied, the professors remain unemployed, the children uneducated, and all the wealth of the institution of no value to it until a lottery grant could be made to yield $30,000. Surely laws are not to be so interpreted.

But the demurrer brings to our notice the objections to the *scire facias*, and perhaps it is needless to look at anything but this writ, and the act of Assembly, which authorized the issuing of it. This act of Assembly is a *charter* granted to the attorney general, and the inquiry now is whether in issuing this writ he was not guilty of an abuser or usurpation ?

Why is he required by the act of 1845 to institute proceedings against the board of commissioners? Because two of the commissioners (their names given) had represented to the General Assembly that the charter or franchises of the said institution had been forfeited by certain acts of three of the commissioners, (their names also given,) which acts have been denied by those three commissioners, "and by mutual consent of the said parties, it has been agreed that a *scire facias* be issued to try the alleged forfeiture." The inquiry to be made is, whether the charter or corporate powers and franchises of said board of commissioners ought, "by reason of abuses of such powers and franchises, to be vacated or annulled." If the acts of said commissioners, or a majority of them shall be judicially declared to amount to a forfeiture of their charter and franchises, all the property, effects and endowments, and all grants heretofore made by the General Assembly, shall vest in *A. B. Hanson*, and the eight others "as commissioners and trustees of the *Frederick Female Seminary*, in the manner in which the said property and franchises are now vested in the original commissioners and trustees by the act of 1839, and the several supplements thereto, who shall be incorporated by said name, and shall be vested with the same powers, rights, duties and obligations conferred upon the said original commissioners and trustees by the last said act."

In the remarks which have already been made, will be found reasons for the opinion of the court, that the act of Assembly does not authorise this proceeding. It is true, as we have been frequently reminded in the course of this argument, that corporations are mere creatures of the law, and must not violate the conditions upon which they are incorporated. But still legal causes must be stated, and the proceeding must be

warranted by the law which directs it.    For every imaginable breach the law does not design that the charter of a corporation must be revoked.    *Stephens*, in his *Commentaries* on the laws of *England*, tells us, that "the exertion of this act of law for the purpose of the State, in the reigns of *King Charles* and *King James* the *Second*, particularly by revoking the charter of the city of *London*, gave great and just offence, though perhaps in strictness of law, the proceedings in most of the cases that occurred were sufficiently regular" and (by way of warning us of the consequence, but too frequently, of a wanton or even unnecessary exercise of power,) he adds, "but the judgment against the charter of *London* was reversed by act of Parliament after the revolution; and by the same statute it is enacted, that the franchises of the city of *London* shall never more be forfeited for any cause whatever."    Hence it is that the sovereign authority reserves to itself the right to determine, not only when such proceedings shall be instituted, but also when violations of a charter shall be overlooked.

It is the opinion of the court, that the act of 1845, ch. 75, did not authorize any proceeding against the person spoken of as additional commissioners.

It is also the opinion of the court, that the act just mentioned only authorized charges of abuse of franchises, and did not authorize any inquiries touching the breaches before us.

The court is not authorized by any thing to be found in this record to say that the board of trustees was not in being, and acting in that character in appointing the professor and opening the school.    The court can discover in the record, nothing which would warrant it in deciding, that the board in opening the school, was not acting up to the end and design for which it was instituted.

JUDGMENT REVERSED,

NO PROCEDENDO,